## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

### Case No: 6:23-cv-00789-CEM-RMN

LAUNCH ON DEMAND LLC,

      Plaintiff,

v.

THE UNITED STATES OF AMERICA,

      Defendant.

_____/

### SECOND AMENDED COMPLAINT FOR INJUNCTIVE RELIEF, DECLARATORY RELIEF, AND MONETARY DAMAGES REQUESTED

Plaintiff Launch On Demand LLC ("Launch On Demand" or "Plaintiff") brings this action against Defendant the United States of America (the "United States," "United States Government," or "Defendant"), and alleges as follows:

### INTRODUCTION

The United States Government cannot compete with "United States commercial providers in the provision of space hardware and services otherwise available from United States commercial providers." *See* 51 U.S.C. § 50702(d)(4). In fact, the United States Government is only able to provide space facilities or services to commercial launches if "**the appropriate agency head determines that**

. . . **equivalent commercial services are <u>not</u> available on reasonable terms**."  51 U.S.C. § 50504(a)(1)(D) (emphasis added).

In violation of this unequivocal congressional mandate, the United States Space Force is competing with Launch On Demand and providing day-of-launch services (and supporting facilities) to commercial space launches.

Since 2018, Launch On Demand has become the leading commercial provider of cost-effective range services: flight safety analysis, airspace integration, launch collision avoidance, launch communications, long range optics, and telemetry (collectively, "Day-of-Launch Services").   Using an integrated technological system that efficiently processes data from the National Airspace System, the Marine Transportation System, and an orbital object catalog, Launch On Demand has revolutionized and optimized the field of Day-of-Launch Services.  Launch On Demand has successfully supported five clients with Day-of-Launch Services at non-Space Force-operated locations, and currently supports eighteen clients in spaceport development services and launch licensing services.  Launch On Demand is ready and able to support more space launches licensed by the Federal Aviation Administration on reasonable financial terms.

But the Space Force has virtually monopolized the commercial Day-of-Launch Services (and supporting facilities) field, and it is currently scheduled to serve 100% of all commercial launches from Space Force locations in violation of

federal law.[1]  The Space Force is further cementing its monopoly in the space industry by misrepresenting to commercial users that to launch from a federal facility, these commercial users must retain the Space Force to provide Day-of-Launch Services.

This lawsuit is filed to enjoin this abject violation of federal law and prevent the United States from stifling commercial innovation with its government monopoly.

## NATURE OF THE ACTION

1.      Launch On Demand brings five claims against the United States.

2.      Pursuant to the Administrative Procedure Act ("APA"), Launch On Demand seeks an injunction: (i) enjoining the Space Force from providing Day-of-Launch Services (and supporting facilities) to commercial launches as currently agreed and scheduled, and (ii) compelling the Space Force to determine and certify the non-availability of United States commercial providers prior to agreeing to provide Day-of-Launch Services to commercial launches as required by the Commercial Space Launch Act.  *See* 5 U.S.C. § 500 *et seq.;* the Commercial Space

---

[1]      Since 2019, approximately 78% of all space launches in the United States were commercial launches from federal spaceports that were supported by the Space Force—and the remaining 22% of all launches from federal spaceports were related to national security or NASA missions.

Launch Act, H.R. 3942, 98th Cong. (1984); 49 U.S.C. §§ 2601-2623; 51 U.S.C. §§ 50901-50923.

3.    Also pursuant to the APA, Launch On Demand seeks declaratory relief in its favor finding that the United States has violated federal laws and congressional intent by failing to act as required by federal laws and its own instructions. *See* 5 U.S.C. § 500 *et seq.*

4.    Launch On Demand further sues the United States for monetary damages for violating the Lanham Act by misrepresenting to the space industry that commercial launches must retain the space services of the United States to launch from a federal facility.  *See* 15 U.S.C. § 1125.

5.    Alternatively, Launch On Demand further sues the United States for an injunction, enjoining the Space Force from misrepresenting to the space industry that commercial launches must retain the space services of the United States to launch from a federal facility.  *See* 15 U.S.C. § 1125.

## THE PARTIES

6.    Plaintiff Launch On Demand LLC is a commercial provider of Day-of-Launch Services for commercial launches licensed by the Federal Aviation Administration ("FAA").  Launch On Demand's principal place of business is located in Cocoa Beach, Florida.

7.    Defendant is the United States of America acting through the United States Space Force, and its predecessor the Department of the Air Force Space Command (collectively, "Space Force").  The Space Force is the sixth service branch of the United States armed forces military service.  The Space Force operates out of six locations including its installation located at the Patrick Space Force Base between Satellite Beach and Cocoa Beach, in Brevard County, Florida.

8.    The United States is *sui juris* and can be sued in this action as provided by 5 U.S.C. § 703, 15 U.S.C. § 1122, and 10 U.S.C. § 9081.

## JURISDICTION AND VENUE

9.    This Court has subject matter jurisdiction over the claims against the United States pursuant to 28 U.S.C. § 1331 because Launch On Demand's claims for violations of the APA and Lanham Act arise under the laws of the United States.  *See* 5 U.S.C. § 500 *et seq.*

10.    The Court also has subject matter jurisdiction under 28 U.S.C. § 1361 to compel an officer or employee of the United States or any agency thereof to perform a duty owed to Launch On Demand.  *See* 28 U.S.C. § 1361.

11.    The APA vests this Court with the authority to: (i) issue an injunction ordering a federal agency to cease violating and to comply with its legal obligations, and (ii) to declare that the United States has violated federal laws.  *See* 5 U.S.C. § 500 *et seq.*

12.    The Lanham Act creates a cause of action for unfair and deceptive commercial practices.  The Lanham Act contains its own waiver of sovereign immunity, added as part of the Trade Amendments Act of 1999, Pub.L. 106-43, 113 Stat. 218, which states that the United States "shall not be immune from suit in Federal or State court by any person . . . for any violation under this chapter." 15 U.S.C. § 1122.

13.    The Court has personal jurisdiction over the United States because a significant portion of the events giving rise to this action occurred in Florida.

14.    Venue properly lies in this District pursuant to 28 U.S.C. § 1391(b)(1)-(2), (c), (e)(1)(C), *inter alia*, because all or a substantial part of the events or omissions alleged in this Amended Complaint occurred in this District.

15.    Launch On Demand has retained the undersigned attorneys to represent it in the prosecution of this action, and is obligated to pay such attorneys their reasonable fees and expenses.

16.    All conditions precedent to the bringing of this action have occurred, have been performed, or have been waived.

## GENERAL ALLEGATIONS

**I.    The Commercial Space Launch Act prohibits the United States Government from competing with U.S. commercial providers of space services.**

17.    On October 30, 1984, the 40th President of the United States of America, Ronald Reagan, enacted the Commercial Space Launch Act to facilitate

the private enterprise of the commercialization of space and space technology. The Act recognized the United States private sector as having the capability to develop commercial launch vehicles, orbital satellites, operate private launch sites and services, and set forth the quest to acquire innovative equipment and services offered by entrepreneurial ventures from the information technology services, remote sensing technology, and telecommunications industries. *See* the Commercial Space Launch Act, H.R. 3942, 98th Cong. (1984); 49 U.S.C. Appendix §§ 2601-2623 (currently referred to as 51 U.S.C. §§ 50901-50923).

18.    The Commercial Space Launch Act was amended in 1988, with Congress finding that: "(1) a United States commercial space launch industry is an essential component of national efforts to assure access to space for Government and commercial users; (2) the **Federal Government should encourage, facilitate, and promote the use of the United States commercial space launch industry in order to continue United States aerospace preeminence**; (3) the United States commercial space launch industry must be competitive in the international marketplace; (4) Federal Government policies should recognize the responsibility of the United States under international treaty for activities conducted by United States citizens in space; and (5) the United States must maintain a competitive edge in international commercial space transportation by ensuring continued research

in launch vehicle component technology and development." *See* Commercial

Space Launch Act Amendments, H.R. 4399, 100th Cong. (1988) (emphasis added).

19.     The Commercial Space Launch Act was further amended in 2015 "to

facilitate a pro-growth environment for the developing commercial space industry

by encouraging private sector investment and creating more stable and

predictable regulatory conditions, and for other purposes." The short title of this

amendment is the "U.S. Commercial Space Launch Competitiveness Act." *See* 2015

H.R. 2262 (Nov. 25, 2015); 51 U.S.C. § 10101, *et seq.*

20.     Indeed, even in the context of the International Space Station,

Congress has made its intention for the economic development of space perfectly

clear by declaring that "**free and competitive markets** create the most efficient

conditions for promoting economic development, and **should therefore govern

the economic development of Earth orbital space**." 51 U.S.C. § 50111 (emphasis

added).

21.     To that end, the director of the Office of Space Commerce has a duty

to ensure "that the United States Government **does not compete** with United

States commercial providers in the provision of space hardware and services

otherwise available from United States commercial providers." 51 U.S.C. §

50702(d)(4) (emphasis added).

II.    **The Space Force cannot provide commercial space services to commercial space consumers <u>unless</u> such services are determined and certified as non-available from a United States commercial provider.**

22.    On December 20, 2019, the 45th President of the United States, Donald J. Trump, signed into law the National Defense Authorization Act for Fiscal Year 2020, creating the Space Force as a separate armed service within the Department of the Air Force.  *See* the National Defense Authorization Act for Fiscal Year 2020, H.R. 2500, 116th Cong. (2020).

23.    According to its own publicly available Instructions, Space Force must comply with two main types of requirements before it services the private space sector: it must (1) determine the non-availability of equivalent, commercial space entities prior to providing its own services; and (2) require or provide written certification requirements demonstrating the non-availability of commercial space entities, with detailed justifications.

24.    Indeed, the United States Government is only able to provide space facilities or services to commercial launches on a reimbursable basis if:

… the Administrator, the Secretary of Defense, or the appropriate agency head determines that—

(A)    the facilities will be used to support commercial space activities;

(B)    such use can be supported by existing or planned Federal resources;

(C)    such use is compatible with Federal activities;

- 9 -

(D)    equivalent commercial services are not available on reasonable terms; and

(E)    such use is consistent with public safety, national security, and international treaty obligations.

51 U.S.C. § 50504.

25.    Similarly, the United States Government's own instructions and operational guidelines establish a procedure designed to ensure that the Space Force does not compete with commercial providers of space services.

26.    Specifically, the Department of the Air Force Space Command, Instruction 10-1215, June 15, 2007 (as updated on April 9, 2024), requires the United States Government to "[d]etermine, as a prerequisite to providing Air Force-owned or controlled facilities, equipment and/or services [to the private sector], that . . . **equivalent commercial services are not available on reasonable terms** where (i) equivalent means substantially the same property in terms of function, capacity, utility, and quality; (ii) available means as and when needed by the user to the user's reasonable satisfaction; and (iii) reasonable means that price and other terms and conditions of use are commercially reasonable." *See* Air Force Space Command Instruction 10-1215, June 15, 2007 (as updated on April 9, 2024), ¶ 11.5.5 (emphasis added).

27.    Space Launch Delta (SLD) 45 (the "Space Wing" or "SLD 45") is the unit of the Space Force responsible for providing range services to commercial

space launches in Cape Canaveral.[2]  Paragraph 11.1.3 addresses the provision of available support the Space Wing may provide.  This instruction establishes that "[t]his term means the space wings **may provide base support where substantially equivalent support is <u>not</u> available from domestic commercial/ spaceport sources on reasonable terms**.  Factors such as price, quality, availability and schedule may be considered when determining whether a service is substantially equivalent."  *See* Air Force Space Command Instruction 10-1215, June 15, 2007 (as updated on April 9, 2024), ¶ 11.1.3 (emphasis added).

28.    In the same order, Paragraph 11.2.1 requires that the United States "[d]etermine, upon receipt of all necessary information from a requestor, when launch property/services or reentry property/services are available/not available to accommodate specific commercial or non-federal user requests.  **<u>A determination of non-availability must be in writing and include supporting rationale</u>. If the commander makes a determination that launch property/ services or reentry property/services are not available, the commander shall forward an information copy of the written notification to HQ**

---

[2]    Cape Canaveral Space Force Station adjoins and connects with the John F. Kennedy Space Center. All references to "Cape Canaveral" herein refer to launches across both sites, as Space Force provides Day-of-Launch Services to all commercial launches at both the Cape Canaveral Space Force Station and the John F. Kennedy Space Center.

**AFSPC/A3R**.”  *See* Air Force Space Command Instruction 10-1215, June 15, 2007 (as updated on April 9, 2024), ¶ 11.2.1 (emphasis added).

29.    Paragraph 11.3 “[r]equire[s] commercial or non-federal users requesting such property/services to provide, among other data, a **written statement** that **no** **U.S. domestic firm can reasonably provide substantially equivalent facilities, equipment and/or services**.  Supporting data must accompany the statement.”  *See* Air Force Space Command Instruction 10-1215, June 15, 2007 (as updated on April 9, 2024), ¶ 11.3 (emphasis added).

30.    Moreover, the requisite written statement described above shall include:

(a)    The “reasons domestic firms cannot provide substantially equivalent facilities, equipment and/or services and the process used to make that determination.”  *See* Air Force Space Command Instruction 10-1215, June 15, 2007 (as updated on April 9, 2024), ¶ 11.3.1.

(b)    “[E]nough information for the wing commander to ensure that provision of Air Force property will not result in giving any commercial user an unfair competitive advantage.”  *See* Air Force Space Command Instruction 10-1215, June 15, 2007 (as updated on April 9, 2024), ¶ 11.3.2.

(c)    A requirement “that when a domestic, substantially equivalent launch property or service does exist, **the commercial or non-federal entity provide the circumstances that preclude the use of the existing firm's facilities, property and/or services**.  When a commercial user represents that it is precluded from using an existing firm, **such reasons shall be provided to the existing firm(s) for comment**. The wing commander should encourage the commercial or non-federal user and existing firm(s) to seek a mutually agreeable solution. If the commercial user and the existing firm(s) are unable to resolve the matter, the wing commander shall determine

whether to allow the commercial user to use Air Force launch base property based upon all the available information. The wing commander may elect to elevate the decision to HQ AFSPC/A3." *See* Air Force Space Command Instruction 10-1215, June 15, 2007 (as updated on April 9, 2024), ¶ 11.4 (emphasis added).

(d)    "Determine whether exclusive possession is in the best interest of both the government and the commercial space industry, thereby allowing exclusive use of launch property to be granted to commercial and/or non-federal users. Consider factors such as the program status, date of valid facility request, completeness of documentation, program maturity, benefit to the commercial space industry, benefit to the government and any other matter the wing commander deems appropriate in making the decision to grant exclusive or shared use. **<u>Such decisions must be made in writing and be accompanied by supporting rationale</u>**. Forward information copies of the written notification and supporting rationale to HQ AFSPC/A3R." *See* Air Force Space Command Instruction 10-1215, June 15, 2007 (as updated on April 9, 2024), ¶ 11.7 (emphasis added).

31.    Paragraph 12.3.1 provides that "[p]rior to initiating any other activities, advise prospective commercial and/or non-federal users to evaluate commercially available facilities and **provide the wing with documented justification** why these facilities will not meet mission requirements. **This will ensure that the Air Force does not compete with commercial providers**." *See* Air Force Space Command Instruction 10-1215, June 15, 2007 (as updated on April 9, 2024), ¶ 12.3.1 (emphasis added).

32.    The 45th Space Wing Instruction 10-601 also echoes the instructions of the Air Force Space Command Instruction 10-1215.

33.    Paragraph 2.2.6 mandates that the Space Force "[e]nsure a non-

federal Range Requestor initiates the UDS process, if applicable, and also provides a **written statement that no domestic source can reasonably provide substantially equivalent support**." *See* 45th Space Wing Instruction 10-601, (September 8, 2020), ¶ 2.2.6 (emphasis added).

34.    Paragraph 4.2.3 establishes that "**[t]he 45 SW can only provide Range Support where non-federal Range Users certify that substantially equivalent support is not available from domestic commercial/spaceport sources on reasonable terms**. Factors such as price, quality, availability, and schedule may be considered when determining whether a service is substantially equivalent. Further, the 45 SW can only provide support to non-federal Users if excess capacity exists at the wing." *See* 45th Space Wing Instruction 10-601, (September 8, 2020), ¶ 4.2.3 (emphasis added).

35.    Department of Defense ("DoD") instructions, directives, and guidance are in accord.

36.    DoD Instruction 3200.18 provides that "[i]n accordance with DoD Component guidance, commanders or directors of activities managing MRTFB[3] [Major Range Test and Facility Based] facilities and ranges **shall ensure that they**

---

[3]    DoD Instruction 3200.11 provides that both the "Eastern Range, 45th Space Wing, Patrick AFB, FL" and the "Western Range, 30th Space Wing, Vandenberg AFB, CA" are "MRTFB Activities." *See* Department of Defense Instruction 3200.11, at Enclosure 2 ("MRTFB ACTIVITIES"), ¶ E2.3 (December 27, 2007, Incorporating Change 2, October 15, 2018).

are not competing with U.S. private industry in providing services to commercial entities." *See* Department of Defense Instruction 3200.18, at Enclosure 3 ("Procedures"), ¶ 3(b) (February 1, 2010, Incorporating Change 2, October 15, 2018) (emphasis added).

37.    DoD Instruction 3230.3 similarly reads: "It is DoD policy to: Encourage the U.S. private sector development of commercial launch operations." *See* Department of Defense Instruction 3230.3, ¶ 4-4.1 (October 14, 1986, Incorporating Change 1, March 7, 1988).

## III.    Launch On Demand is a successful commercial provider of Day-of-Launch Services.

38.    Launch On Demand was founded in 2018 by Burton Catledge.  Mr. Catledge is a retired Colonel of the United States Air Force where he served as commander of the 45th Operations Group at Patrick Air Force Base, Florida.  In that role, Mr. Catledge oversaw the Eastern Range's military, commercial, NASA, and ballistic missile launch operations from Cape Canaveral Air Force Station and Kennedy Space Center to Ascension Island, South Atlantic.  The 45th Operations Group operates and maintains $20 billion in instrumentation and infrastructure for the 15-million square mile Eastern Range, operates three airfields, and supports 10,000 customers with communications services.  Prior to this assignment, Mr. Catledge was Deputy Director for Cyber and Space Programs, Office of the Under Secretary of Defense for Acquisitions, Technology and Logistics/Deputy Assistant

Secretary of Defense (C3, Cyber and Business), at the Pentagon in Washington, D.C. Mr. Catledge received many promotions and accolades during his employment with the Air Force, including but not limited to the Meritorious Service and Medal with two oak leaf clusters, and the Air Force Commendation Medal with oak leaf cluster.

39.    In 2018, Mr. Catledge retired from the Air Force to start Launch On Demand. Since then, Launch On Demand has been providing commercial launch services and has quickly become an industry leader in providing efficient and effective services to the space launch industry, including to various established commercial space enterprises.

40.    Launch On Demand is a commercial provider of space launch services for FAA-licensed launches. Launch On Demand delivers full-service launch range solutions, reentry, and spaceport technical services through cost-effective launch vehicle tracking, collision avoidance analysis, frequency monitoring, launch area air and sea surveillance, and safety analysis. Launch On Demand further ensures that Range Safety Launch Commit Criteria ("RSLCC") are met prior to approval for launch and enables safe transit in Low Earth Orbit ("LEO").[4]

---

[4]    An LEO is an orbit that is relatively close to the Earth's surface. Normally, it is at an altitude of less than 1000 km but could be as low as 160 km above the Earth. By comparison, most commercial airplanes do not fly at altitudes much

41.     Using an integrated approach that innovatively leverages data from the National Airspace System, the Marine Transportation System, and an orbital object catalog, Launch On Demand provides an integrative approach to ensuring that standard safe launch criteria are met prior to approval of a launch.  Through its vehicle tracking services, Launch On Demand can determine launch windows to provide collision avoidance analysis for launch flight paths; monitor frequencies prior to and during launch; surveil air and sea areas around a launch site; and provide safety analysis for a launch.  Launch On Demand's services are essential to the successful and safe placement of launch vehicles in space.

42.     Launch On Demand's proprietary system optimizes the delivery of Day-of-Launch Services.  Moreover, the flexibility of Launch On Demand's operational structure allows Launch On Demand to operate with less than ten staff members per launch, as contrasted with the hundreds of employees required by the Space Force to provide the same services.  Thus, Launch on Demand is more than qualified to provide Day-of-Launch Services.  And indeed, Launch On Demand can provide reasonably equivalent or better services than the Space Force and is currently able to provide Day-of-Launch Services to commercial launches in the United States on reasonable terms.

---

greater than approximately 14 km, so even the lowest LEO is more than ten times higher than that of a commercial airplane's.
*See* https://www.esa.int/ESA_Multimedia/Images/2020/03/Low_Earth_orbit.

43.    If the Space Force had complied with its statutory obligations and refrained from competing with United States providers, Launch On Demand would have been able to provide Day-of-Launch Services to commercial users on reasonable terms.   This is especially true given the superiority of Launch on Demand's Day-of-Launch Services offerings.

**IV.    Launch On Demand repeatedly tried to communicate with the Space Force but was ignored.**

44.    Since Launch On Demand's inception in 2018, Mr. Catledge and his team have made numerous attempts to communicate with the United States Government to advise it that Launch On Demand is a "United States commercial provider" of Day-of-Launch Services for launches that have been licensed by the FAA.

45.    For example, on November 16, 2018, Mr. Catledge corresponded with John Raymond, the 1st Chief of Space Operations of the Space Force, and among other things, explained that in 2019, Launch On Demand would provide commercial launch services such as collision avoidance, vehicle tracking, frequency management, communication, and weather tracking for all FAA-licensed launches.

46.    In the spring of 2019, Mr. Catledge had a telephonic conference with Major General DeAnna M. Burt, then the Director of Operations and

Communications, Headquarters Space Operations Command.  During that call, Mr. Catledge shared the mission of Launch On Demand and explained how it would operate within the confines of 51 U.S.C. § 50504.

47.    On July 17, 2020, Mr. Catledge participated in a meeting with the National Space Council where he discussed, among other things, Launch On Demand's capabilities and the applicable law in favor of commercial providers.

48.    Then in September of 2020, Mr. Catledge corresponded with Lieutenant General John Thompson, Space and Missile Center Commander in charge of space acquisitions, addressing these same points.

49.    In March of 2021, Mr. Catledge attempted to schedule a meeting with Brigadier General and Space Force Commander Stephen G. Purdy to discuss transitioning Eastern Range FAA customers to Launch On Demand's commercially available flight safety analysis in lieu of Space Force support.

50.    In September 2021, Mr. Catledge requested a meeting with the Secretary of the Air Force.  And on November 8, 2021, the office of the Secretary of the Air Force delegated the meeting to the acting head of the Space Acquisitions Secretariat, Brigadier General Steven P. Whitney, who agreed to further discussions.  Although Mr. Catledge followed up on January 18, 2022, the meeting was never scheduled, and Mr. Catledge never heard back from the Space Force again.

51.     Despite these numerous communications and attempted communications with the Space Force regarding Launch On Demand's capabilities as an available commercial provider of Day-of-Launch Services, Launch On Demand was ignored and prevented from providing its Day-of-Launch Services to commercial users, who instead became customers of the Space Force.  Given the superiority of its Day-of-Launch Services offerings, there is a substantial likelihood that the commercial users who became the Space Force's customers would have selected Launch On Demand instead.

## V.     Launch On Demand provides equivalent commercial Day-of-Launch Services.

52.     Launch On Demand's services are "equivalent"– or indeed, superior commercial services to those provided by the Space Force, and at all material times have been available on reasonable terms.  Launch On Demand has successfully provided the following launch services for FAA-licensed launches: 1) telemetry service, 2) weather service, 3) surveillance, and 4) safety analysis.  Launch On Demand is able and willing to provide Day-of-Launch Services to all future commercial launches from Space Force spaceports.

53.     For example, Launch On Demand provides Launch Collision Avoidance ("L-COLA") services *every second* of a launch window, leveraging Launch On Demand's unique algorithms and processes.  In comparison, the L-COLA services provided by the Space Force can only provide safety analysis at

the *top of each minute*.  As such, not only does Launch On Demand provide L-COLA services that are equivalent to those provided by the Space Force, but actually Launch On Demand's commercial services *exceed* the capabilities of the services which the Space Force is currently providing.  Additionally, Launch On Demand provides its launch services in a federated architecture that supports launches at discrete geographic locations.  Accordingly, Launch On Demand is able to support launches from any spaceport.

54.    Launch On Demand has successfully provided telemetry services for two commercial launches.  Launch On Demand's weather services are provided by a weather support team that previously supported the Space Force.  Launch On Demand's surveillance services exceed the capabilities and extend to ranges farther than the Space Force's radar-based surveillance approaches.  As for safety analysis, Launch On Demand uses the same software for debris analysis that the Space Force uses, and Launch On Demand's L-COLA analysis meets all FAA-license requirements for launches and is targeted toward increasing the range of analysis and level of safety as compared to the Space Force's current approach.

55.    Launch On Demand is able and ready to provide Day-of-Launch Services to commercial users launching from Space Force facilities, as is demonstrated by Launch on Demand's success in providing such services to non-Space Force launches and receiving government approval for products such as its

L-COLA software.

56.    Because Launch On Demand's Day-of-Launch Services are either equal to Space Force's offerings, or, in many respects superior, there is a substantial likelihood that, but for the unlawful behavior of the Space Force, a substantial majority of commercial users would retain Day-of-Launch Services from Launch On Demand.

## VI.    The Space Force violated its legal obligations under the Commercial Space Launch Act.

57.    Since March 2019, the Space Force has provided Day-of-Launch Services (and supporting facilities) to approximately 194 commercial launches. Space Force is currently providing Day-of-Launch Services (and supporting facilities) to 100% of all U.S. commercial launches from Space Force locations, and has decided to continue to provide these services in violation of federal law and with full knowledge that Launch On Demand is an available United States commercial provider of Day-of-Launch Services.  Indeed, the Space Force has agreed to and is currently scheduled to provide Day-of-Launch Services for all commercial launches from Cape Canaveral and other Space Force spaceports in the United States.  The decision to continue to provide launch services to commercial launches (and supporting facilities), combined with the abject failure to certify the non-availability of United States commercial providers prior to providing such services, violates federal law and is contrary to the Congressional

intent, demonstrated in many instances, to have "free and competitive markets" in the space arena.

58.    Space Force's actions providing Day-of-Launch Services for all commercial launches from Cape Canaveral is especially noteworthy.  Cape Canaveral is the only location in the United States where commercial users can access all known orbital regimes, based upon its proximity to the equator and its ability to launch eastbound over the Atlantic Ocean.  It has become the most popular launch site in the United States for commercial users.

59.    The Space Force has failed to make the required determinations that other United States commercially available entities with reasonable terms were unavailable before providing government facilities or services to commercial users.  *See* 51 U.S.C. §§ 50702(d)(4); 50504(a)(1)(D); 50903(b)(2); 50913(a); and Department of the Air Force Space Command Instruction 10-1215, ¶¶ 11.1.3, 11.5.5.

60.    The Space Force has further failed to require the written certifications of non-availability of other commercial entities as mandated by its own internal regulations. *See* Department of the Air Force Space Command Instruction 10-1215, ¶¶ 11.2.1, 11.3, 11.3.1, 11.3.2, 11.4, 11.7, 12.3.1; and 45th Space Wing Instruction 10-601, ¶¶ 2.2.6, 4.2.3.

61.     Despite its failure to determine whether such services were available from United States providers, the Space Force has agreed to provide thirty Day-of-Launch Services to commercial users from Space Force facilities at Cape Canaveral/Kennedy Space Center and Vandenberg Space Force Base from September 26, 2023 to February 2024.  A list of such scheduled launches, obtained via publicly available data, is attached as **Exhibit A**.

62.     Launch On Demand is capable of providing, and able and ready to provide, Day-of-Launch Services on reasonable terms for commercial launches from Space Force spaceports, and given the superiority of its Day-of-Launch Services offerings, there is a substantial likelihood that commercial users would have selected Launch On Demand to service the thirty-one launches currently scheduled.

63.     The Space Force has admitted that it agreed to provide Day-of-Launch Services (and facilities) to the commercial users currently scheduled to launch identified in **Exhibit A** without determining whether such services were available from United States providers.  In fact, in a March 30, 2021 email to Launch On Demand, Thomas Eye, then Director of Plans & Programs for the 45th Space Wing, confirmed that the Space Force's position was that it was *not* required to conduct any analysis of the availability of United States providers for such services, writing: "We have coordinated with our legal team, and they disagree

with your analysis that current law requires DoD [Department of Defense] to exclusively use available commercial launch services." As admitted by the Space Force, therefore, the Space Force's decision to provide Day-of-Launch services and facilities for each of the launches listed in **Exhibit A** is in violation of the mandate of 51 U.S.C. § 50504(a)(1)(D).

64.    For an example of how the Space Force views its relationship with private industry, a February 28, 2023, article published on the Space Force website entitled "CIC executive summit enhances critical government-commercial relationship" quotes General Chance Saltzman as saying: "Partnering [with private industry] is not transactional [for the Space Force.] It is a deeper relationship built on trust and mutual benefit that ensure cooperation will continue even under geopolitical, financial, and adversarial stress."

65.    More recently, the Space Force has openly acknowledged the financial incentives behind its relationship with commercial launch providers. Speaking at a National Space Club Florida Committee luncheon on January 14, 2025, Colonel Meredith Beg underscored that user fees collected from commercial launch customers are not only essential for sustaining the Space Force's current operations but also serve as a key funding source for the planned expansion of the Eastern Range.  With projections exceeding a 100 launches annually at the Eastern Range alone, Colonel Beg emphasized that the Space Force cannot rely solely on

federal appropriations and must turn to commercial customers to offset operational costs and fund its ongoing development and expansion plans. In other words, while the Space Force presents its relationship with private industry as collaborative, it is also fundamentally commercial—driven not only by collaboration but by the revenue that commercial launches generate.

66.     Upon information and belief, the Space Force has even provided Day-of-Launch Services for private spaceports, including one in Boca Chica, Texas, in further violation of 51 U.S.C. § 50504(a)(1)(D).

## VII.  The Space Force has advertised misrepresentations about the options of commercial launch providers.

67.     The Space Force has engaged in an effort to misrepresent its role as the sole provider of Day-of-Launch Services for commercial space launches, violating its statutory obligations and misleading the space industry. Through direct advertising and promotional statements, written materials disseminated to commercial users, and a broader campaign of misrepresentation, the Space Force has fostered a false perception of exclusivity when it comes to the provision of launch-related services. These actions have harmed competition in the Day-of-Launch Services industry by steering commercial users away from private providers like Launch On Demand, which are fully capable of delivering equivalent or superior Day-of-Launch Services to the customers that the Space Force is improperly capturing.

## A. Misleading representations promoting Space Force exclusivity to spaceport customers.

68.    In further violation of its non-competition statutory obligations, the Space Force has advertised to members of the space industry that it is the single option for Day-of-Launch Services for commercial users seeking to launch from Space Force locations.  These misrepresentations continue to be actively promoted by Space Force personnel.

69.    For instance, in September 2013, during the "Space Vehicle Operations (SVO) Focus Group #2"—a multi-day industry event held on September 25 and 26 and attended by space industry participants—a senior Space Force official, Mr. Paul Rosati, made misleading statements falsely suggesting commercial launch providers were required to procure flight safety analysis services exclusively form the Space Force in order to launch from federal ranges.

70.    As reflected in the event's agenda and list of attendees, the SVO Focus Group was not a private internal meeting but a widely attended industry event, bringing together key stakeholders from commercial aviation, government agencies, private launch providers, aerospace contractors, and air traffic management groups.  Participants—including representatives from NASA, American Airlines, Spaceport America, MITRE, Booz Allen Hamilton, Mosaic ATM, ENSCO, and other industry players—convened to discuss the evolving

regulatory frameworks, operational challenges, and technological advancements in commercial space launches.  One of the focal points of the event was clarifying the requirements for commercial users seeking to launch from federal facilities.

71.    One key session addressed flight safety analysis and included a discussion of operational frameworks wherein private entities would provide flight safety services for launches from federal ranges—a discussion particularly relevant to industry stakeholders who make logistical and purchasing decisions regarding launches from these spaceports.  During this discussion, Mr. Rosati, the then SLD 45 Safety Chief, addressed the group to share the Space Force's views on the topic.  Speaking to the assembled industry representatives, Mr. Rosati made a definitive and categorical statement, asserting that commercial launch providers had no choice but to retain the Space Force for flight safety analysis if they wished to launch from a Space Force-operated range.  Specifically, he stated:  "I don't care what [commercial providers] can do, if they want to fly from my range, I'm going to do the Flight Safety Analysis."

72.    When some of the attendees pointed out that the discussion stemmed from the operational and technical advancements that made commercial providers well suited to meet regulatory standards and conduct flight safety analysis themselves, Mr. Rosati doubled down on his assertion of exclusivity, stating: "that

doesn't matter, I'm not letting them fly from my range unless I'm sure it's safe, and the only way I can do that is if I do the analysis."

73.    Mr. Rosati's remarks left no room for ambiguity.  He unequivocally conveyed that only the Space Force could conduct flight safety analysis for launches from federal ranges.   Speaking at an industry-wide event before commercial launch contractors, aerospace firms, and regulators, Mr. Rosati framed flight safety analysis as an exclusive Space Force function, dismissing the prospect of commercial alternatives.

74.    The effect of his statements was clear: by presenting these services as a non-negotiable requirement rather than one that could be competitively sourced, his statements discouraged industry participants from considering private providers as viable alternatives to the Space Force and conveyed the misperception that retaining the Space Force for flight safety services was mandatory for anyone wishing to launch from the Eastern or Western Ranges. These statements are literally false and misleading because it is not true that commercial launchers cannot launch from a federal range unless the Space Force is retained to conduct all flight safety analysis.

75.    In addition to participating in industry-wide events, the Space Force maintains designated communication channels through SLD 45 and SLD 30 safety personnel for commercial launch providers to resolve technical and logistical

inquiries as they navigate the launch process. These communications—including direct meetings, written correspondence, and telephonic discussions—occur in the regular course of business between the Space Force and commercial users launching, or attempting to launch, from a federal facility.  Through these "customer service" channels, Space Force personnel provide directives on launch safety compliance, which, in turn, directly influence range users' operational decisions, including procurement and contracting choices.

76.     In this context, on two separate occasions in 2017, a former SpaceX employee,[5] had conversations with the Space Force as SpaceX prepared to launch from a federal spaceport.  Seeking to determine whether outsourcing Day-of-Launch Services to more economical third parties was a viable option, SpaceX relied on these communications to inform its procurement decisions.  On each occasion, Mr. Rosati made a statement to the effect of: "I'm not going to approve a launch from the Cape [Canaveral] unless I do the safety [analysis]."  These statements were not isolated incidents but part of a broader pattern of Space Force communications, routinely conveyed to commercial users to inform their operational and contracting decisions for launches from federal ranges.

---

[5]     The identity of this individual will be disclosed to Defendant in due course but is being withheld at this stage to safeguard the individual's privacy.

77.    Similarly, in December 2022, the Space Force held a telephonic meeting with representatives of the space launch industry, including Day-of-Launch Services providers, aerospace manufacturers, satellite service providers, and other key stakeholders engaged in commercial launch operations.    The discussion centered on the regulatory and logistical requirements for securing flight safety analysis approvals from the FAA and Space Force, an essential step in the process for launching from federal ranges.

78.    Participants in this phone call included VAYA Space, ARCTOS, and Launch On Demand—companies that provide or procure launch services and are directly affected by the availability of private alternatives for safety assessments in the market.    Indeed, a key purpose of this call was for VAYA Space to obtain guidance on the feasibility of utilizing commercially available safety analysis providers as it prepared for its first launch from a federal range.    Having previously conducted successful launches from non-Space Force-operated ranges, VAYA Space sought clarity on whether it could contract with the same third-party providers for flight safety analysis it had used in the past—including Launch On Demand—rather than relying exclusively on the Space Force.    The Space Force's response to this inquiry, therefore, directly influenced VAYA Space's procurement and contracting decisions, as well as overall approach to compliance as it progressed toward launch day.

79.     During this phone call, Mr. Rosati, speaking in his official capacity as SLD 45's Safety Chief, made false and misleading statements that conveyed the idea that commercial launch providers, such as VAYA, had no choice but to retain the Space Force for flight safety analysis if they wished to launch from federal ranges. Specifically, when an attendee inquired about the possibility of utilizing commercially available alternatives for flight safety assessments, Mr. Rosati categorically stated: "the SLD 45 will do the assessments." Mr. Rosati's view appeared to be based on the conclusory and false assertion that commercial providers "don't have the data" and therefore "can't do the assessments" themselves.

80.     Indeed, when a VAYA Space representative referenced FAA regulations expressly permitting commercial launcher to contract with third-party service providers for flight safety analysis, Mr. Rosati discredited the possibility, stating that even after FAA approval, "we're gonna do all the analysis that gets all the other things complied to." According to Mr. Rosati, this was a mandatory requirement for commercial users in the Eastern and Western Ranges because these are federal facilities with "one-of-a-kind assets."

81.     Mr. Rosati' statements during this call with industry participants had direct commercial implications. By framing flight safety analysis as an exclusive Space Force function and categorically dismissing commercially available

alternatives, he actively steered VAYA Space away from considering private service providers. Thus, his statements not only influenced VAYA Space's contracting decisions but also reinforced the broader misperception that retaining the Space Force for these Day-of-Launch Services is mandatory for any commercial entity seeking to launch from a federal range.

82.    More recently, while speaking at the National Space Club Florida Committee luncheon—an industry-wide event attended by launch services providers, aerospace contractors, and other launch industry stakeholders—Colonel Meredith Beg (SLD 45's Deputy Commander) made false and misleading statements suggesting that commercial launch users must obtain, and pay for, weather forecasting, telemetry, and range services exclusively through the Eastern Range. While describing the critical role of collecting customer fees stemming from the provision of Day-of-Launch Services, Colonel Beg stated that the Eastern Range should be seen by its commercial users as a Port Authority, which collects fees from all users for the use of its infrastructure. However, by framing the Space Force's role in this manner, Colonel Beg conveyed to industry attendees the false notion that paying the Space Force for these Day-of-Launch Services was not merely an option, but a necessary condition for launching from a federal spaceport.

83.    Colonel Beg's statements were misleading because they negated the availability of private alternatives for these services and falsely suggested that commercial launch providers must retain the Space Force for Day-of-Launch Services.  Unlike the Port Authority, the Space Force is not allowed to compete with commercial providers of Day-of-Launch services.  Indeed, by equating its fee-based services with unavoidable access charges, Colonel Beg conveyed the false perception that commercial launch users have no choice but to procure these services from the Space Force, thereby deterring competition and improperly steering business away from private providers such as Launch On Demand.

84.    Most recently, on February 27, 2025, Space Launch Delta 45 publicly issued a statement celebrating back-to-back commercial launches from the Eastern Range, emphasizing the Space Force's "strong partnerships with industry leaders" and describing its role as "ensuring a secure and resilient space domain, enabling seamless access to orbit and beyond."  This statement, disseminated via LinkedIn, misleadingly reinforces the notion that commercial launch providers must rely on the Space Force's services to conduct launches from federal facilities.  The post further asserted that these missions "highlight our commitment to the acceleration of #innovation and assured access to space," suggesting that the Space Force plays an indispensable role in enabling commercial access to space.

85.    As the preceding paragraphs make clear, the Space Force has repeatedly misrepresented that it is the exclusive provider of Day-of-Launch Services for commercial launchers seeking to use federal facilities.  This claim is both literally false and misleading.  Over the years, these misrepresentations have been disseminated to key industry participants at widely attended industry events and through the Space Force's designated "customer service" channels, directly influencing commercial launch providers' procurement and contracting decisions.

86.    Upon information and belief, similar representations to Mr. Rosati's and Colonel Beg's have been repeatedly made by the Space Force in an effort to induce customers to believe they must hire the Space Force to provide Day-of-Launch Services for commercial launches from the Space Force spaceports. Indeed, as discussed in more detail below, these misrepresentations have been embedded in official Space Force literature and written materials distributed to commercial launchers seeking access to Space Force-operated ranges.

**B. Misrepresentations in Space Force written materials provided to Space Force customers.**

87.    The Space Force has further disseminated misrepresentations through its written materials—documents that are distributed to every commercial user seeking to launch from federal spaceports, including Cape Canaveral and Vandenberg.  These materials imply exclusivity, falsely suggesting that commercial users must rely on the Space Force for Day-of-Launch Services,

even when, as noted above, equivalent or superior services are available from private providers like Launch On Demand.

88.    For example the "CSOSA Annex A Template 2022"—a standardized template agreement sent by SLD 45 to every commercial user requesting a launch from Cape Canaveral—contains multiple misleading statements that falsely suggest the Space Force is the exclusive provider of Day-of-Launch Services for federal range users.  This Template states that "[t]he SLD 45 **shall** . . . Determine criteria for flight termination action to protect on-base personnel and resources and when applicable, to protect off-base public." CSOSA Annex A Template 2022 at Article 13(1)(m) (emphasis added).  This language is literally false or, at a minimum, misleading because it suggests that SLD 45 is exclusively responsible for flight termination action criteria, disregarding the fact that private providers are fully capable of performing these functions in compliance with FAA regulations.

89.    Similarly, this Template also states that, "[t]he SLD 45 **shall**: Provide technical guidance and support for obtaining or interfacing with data transfer systems including safety (countdown, missile lift-off, telemetry, metric, and voice and video display systems) . . . ." CSOSA Annex A Template 2022 at Article 18(1)(a) (emphasis added).  Another false statement that misleads commercial users into believing that only SLD 45 can ("**shall**") offer the technical guidance and support

- 36 -

described, including countdown, lift-off, and telemetry services.  This statemen is literally false and misleading because private commercial providers are equally capable of offering those services.  Indeed, as noted earlier, Launch On Demand has successfully offered some of these services in the past.

90.    Additionally, this Template also states that, "[t]he SLD 45 **shall**: Provide system and mission constraint evaluation and weather forecasting services in support of User launch/test operations for determination of acceptable meteorological conditions. . . . The 45 [Weather Support] **supports all** space and ballistic missile launches . . . ." CSOSA Annex A Template 2022 at Article 24(1)(a)-(b).  This statement is likewise false and misleading because it authoritatively declares that the Space Force "shall" provide weather support services for "all" launches,  creating the false impression that weather forecasting and evaluation for commercial launches are exclusively performed by the Space Force.  In reality, private providers such as Launch On Demand offer equivalent or superior weather forecasting services to those offered by the Space Force.  In fact, Launch On Demand has successfully supported commercial launches with these services, showing that commercial alternatives exist and are fully capable of meeting industry needs.

91.    The Space Force also disseminates pre-filled template forms which purport to guide commercial customers in the process of completing required

documentation for access to federal spaceports. One of those template forms is the "Sample Program Introduction for Commercial Customers" ("Sample PI"). This document is particularly deceptive because it provides pre-filled answers with boilerplate language that effectively induce commercial users to conclude that SLD 45 is the only viable provider of Day-of-Launch Services for launches from federal ranges. By framing these pre-filled answers as guidance for mandatory certifications, the document falsely conveys that only the Space Force can provide Day-of-Launch Services, while misleadingly suggesting that private providers are incapable of supporting commercial missions from federal facilities.

92.    For example, the Sample PI document states: "The Delta pre-launch readiness operations **will be conducted** by [customer], **with support from SLD 45 and SLD 45 contractors**, as required." Sample PI at 8. This assertion is literally false because pre-launch readiness need not be exclusively provided with the support of SLD 45 or its hand-picked contractors. As noted above, these Day-of-Launch Services can be provided by other available commercial providers.

93.    Similarly, the Sample IP document provides that, "[t]he Delta **requires direct support from** SLD 45 and SLD 45 contractors," and specifies that "SLD 45 **is requested** to receive RRR telemetry . . . **and**: Provide telemetry data to control center trailer . . . Telemetry data is desired for as much of flight as possible, **using existing range resources.**" *Id.* at 8, 10 (emphasis added). By embedding

these pre-filled statements in a document meant to assist commercial users with regulatory compliance, the Space Force falsely presents SLD 45's involvement and "existing range resources", including telemetry services and data transmission, as a prerequisite for launching from a federal range. This language actively induces new customers to believe that only the Space Force's resources are acceptable, reinforcing the false notion that private providers are not viable alternatives.

94.    Beyond these literally false statements, the Space Force further misleads customers through the Sample IP document by incorporating pre-filled template answers that guide customers to certify, incorrectly and in conclusory fashion, that no equivalent Day-of-Launch Services are available from domestic providers.    For instance, the Sample IP document includes a pre-written certification that states the following: "As a prerequisite to requesting these services, CUSTOMER NAME certifies that equivalent range services are not available on reasonable terms and conditions from any U.S. domestic firm." *Id.* at 2. The Sample IP document goes on to represent in boilerplate language that no domestic providers offer the same "function, capacity, utility, and quality," can "meet the current CUSTOMER NAME launch schedule," or can offer the Day-of-Launch Services at "a similar price and other terms and conditions to those services requested from the SLD 45." *Id.* These false assertions directly induce

customers to accept SLD 45 as their only option, ignoring the existence of capable private competitors like Launch On Demand.

95.     The Sample IP document further emphasizes that this certification is required and "the above language **must be contained** in every Program Introduction submitted by a commercial company to the SLD 45," *id.* at 3, reinforcing the impression that compliance with the Space Force's narrative is mandatory.  Nowhere in its boilerplate language and pre-selected answers does the Space Force advice customers that a certification of commercial non-availability must be accompanied by supporting data in order to satisfy the Space Force's own regulations.  *See* ¶ 11.3, Air Force Space Command Instruction 10-1215, June 15, 2007 (as updated on April 9, 2024) ("Supporting data must accompany the statement").  By embedding such biased language and expressly making it mandatory, the Space Force misleads customers into believing that retaining its services is not only required but also the only viable option for conducting their launches for a federal spaceport.

96.     However, misrepresentations regarding the exclusivity of Space Force services are not limited to the Eastern Range (*i.e.*, SLD 45).  Documents disseminated by SLD 30 to customers of the Western Range at Vandenberg Space Force Base similarly contain false statements that perpetuate the misconception that the Space Force must provide those missions with Day-of-Launch Services.

97.    One such document is a March 29, 2018, Statement of Support memorandum issued to a commercial launch provider in connection with its launch program from the Western Range.  This document sets forth various Space Force-provided services and requirements, misleadingly suggesting that SLD 30's flight safety analysis was a prerequisite for the provider's ability to launch.  The Air Force explicitly stated: "30 SW Safety **will need to do an analysis** to determine the acceptable range of launch azimuths, flight termination requirements and risks for launches from [the provider's launch site] once [the provider] submits a Preliminary Flight Data Package for their program." Statement of Support Memo (March 29, 2018) (emphasis added).

98.    A document attached to this Memo, titled "Critical Support Response Document," further reinforced this point, stating that an "Explosive Safety Sitting Package **is required to be developed by 30 SW/SE** for [the provider's launch program]" and that "**[30 SLD] Safety will need to do an analysis** to determine [the provider's] launch availability[.]"  *Id.*  These statements falsely and misleadingly portray SLD 30 as the exclusive provider of flight safety and risk analyses, even though private providers possess the capacity to perform these functions in compliance with safety standards.

99.    Similarly, a March 12, 2014, Statement of Support issued by SLD 30 to another costumer for its launch program from the Western Range further

promotes the false narrative that the Space Force must conduct flight safety analyses for all commercial launches from federal ranges. Issued in response to the provider's request to conduct launch operations, the document outlines Space Force support services and misleadingly presents SLD 30's role in flight safety analysis as mandatory.

100.    Among other things, the document stated that "[p]reliminary coordination with 30 SW/SE indicates that **[SLD 30] Safety needs to fully assess** the landing CONOPS for [the provider's launch site] **and conduct a Preliminary Flight Safety Analysis** to assess the risk for [the provider's planned operations]." Statement of Support Memo (March 12, 2014) (emphasis added). By embedding this language in a formal Statement of Support—an essential document for the launch provider's planning and approvals—the Space Force falsely portrays itself as the mandatory provider of flight safety analysis, reinforcing the misconception that commercial launch providers must rely on SLD 30 for these services.

101.    Likewise, the "SLD 30 PSG – 2023 FINAL(CUI)" document sent to all commercial users seeking to launch commercially from Vandenberg Space Force Base, similarly states that, "SLD 30 will provide airspace, offshore and rail clearance for launch/test operations through 2 ROPS/DON in coordination with the SLD 30 Launch Safety office and all outside agencies." SLD 30 PSG – 2023 FINAL(CUI) at 18.

102.    This document also states: "SLD 30 **shall** provide system and mission constraint evaluation and weather forecasting services in support of User launch/test operations for determination of acceptable meteorological conditions. The service shall include forecasting, tracking, advisories, and warning services. The 30th Operations Support Squadron's Weather Flight (30 OSS/OSW) supports all space and ballistics missile launches from VSFB and provides 24-hour meteorological watch to include forecasts, observations, advisories, and warnings . . . ." SLD 30 PSG – 2023 FINAL(CUI) at 51 (emphasis added).    These representations are literally false and mislead spaceport customers into believing that weather forecasting and evaluation are exclusively available through SLD 30.

103.    This document further claims: "The [SLD 30] Safety Office **is responsible for** initiating and/or conducting a number of safety-related analyses or studies, depending on the User's Program, to include: . . . Explosives Safety Site Analysis . . . Debris-Toxic-Blast Overpressure Hazard Studies . . . Risk Assessment . . . Launch Collision Avoidance (LCOLA).  SLD 30 PSG – 2023 FINAL(CUI) at 66 (emphasis added).

104.    Finally, the document states: "Telemetry data will be recorded from acquisition of signal (AOS) to loss of signal (LOS) within the limitations of the instrumentation . . ." and under the subheader, "Telemetry Transmission, Processing and Display for Safety" the document states: "The SLD 30 Commander

has responsibility for flight safety on VSFB launches vehicles . . . To perform required safety functions, the decommutation and display of telemetered position, velocity, and status data from the launch vehicle(s) will be required. This information will be used by the MFCO to continuously assess vehicle position, performance and health status, and to make flight termination decisions." SLD 30 PSG – 2023 FINAL(CUI) at 84-85.  These statements falsely present telemetry and flight safety functions as responsibilities exclusive to SLD 30, creating the false impression that no other provider can perform these services.

105.    Additional documents disseminated by the Space Force perpetuate the false impression that it is the sole provider of critical Day-of-Launch Services, undermining the role of private competitors like Launch On Demand.  In the document "USSF CSCOSA Template – 16 Dec 20," the Air Force defines "Launch Services" as "[t]hose activities involved in the preparation of a launch vehicle, payload, crew (including crew training), or space flight participant for launch and the conduct of a launch or reentry which are specifically performed by Department of the Air Force or Department of the Air Force contract personnel, to include but not limited to flight safety analysis . . . ." USSF CSCOSA Template – 16 Dec 20, at Article II.N.  This definition falsely states, or implies, that Day-of-Launch Services, including flight safety analysis, are exclusively performed by the Department of the Air Force or its contractors, when in reality, private commercial providers

performs these functions with capabilities that meet or exceed Space Force standards.

106.    Similarly, in the document entitled "Space Launch Delta 30 Annex B to the [CSOSA] for Commercial Space Launch Activities (v 2021)," the Space Force states that "[i]n addition the services addressed in the Space Launch Delta 30 Program Support Guide, the commander may require the use of government provided services by the User if the commander determines that failure to use such services would be detrimental to public health or safety, to property (either public or private), or to any national security interest or foreign policy interest of the United States."  This is a misleading statement that suggests that Space Force-provided services are uniquely capable of ensuring safety, security, and regulatory compliance for launches departing from federal ranges.

107.    The Day-of-Launch Services described in paragraphs 68 through 107, which the Space Force represents as exclusively available through its wings (SLD 30 and 45), are also readily offered by domestic commercial providers such as Launch On Demand.  Contrary to the Space Force's representations, commercial aproviders offer these services with equivalent or superior capabilities, meeting all regulatory standards and offering commercial users a viable, competitive alternative.

### C. The Space Force's deliberate campaign of misrepresentation in the space industry.

108.    The Space Force's misrepresentations go beyond isolated instances or statements and constitute an organized campaign of misrepresentation that has achieved widespread dissemination in the space industry and has materially affected the decisions of commercial users to use Space Force for Day-of-Launch Services at Space Force locations.  In fact, the Space Force has been successful in inducing commercial users to use the Day-of-Launch Services provided by the Space Force from 2019 through the present, a list of such launches since is attached as **Exhibit B**.  Those launches should have been serviced by United States commercial providers like Launch On Demand.

109.    For example, one Space Force web page reads: "This page is intended to provide information and forms for customers wishing to conduct operations on the Eastern Range.  New **customers** wishing to conduct ground operations at Patrick Space Force Base or Cape Canaveral Space Force Station **need to initiate contact with the SLD 45 Planning Office at least six months prior to their proposed start date**." *See* https://www.patrick.spaceforce.mil/About-Us/New-Customer-Information (last accessed September 14, 2023) (emphasis added).

110.    "SLD 45 Planning Office" is the entity also known as the "45th Plans and Programs Office (45 SW/XP)," which serves as the "front door" for the 45th Wing. *See* Instruction 1.1., 45th Space Wing Instruction 10-601 (September 8, 2020).

Therefore, the false representation in the Space Force web page induces commercial users to believe that they must choose the Space Force for Day-of-Launch Services in order to "conduct operations on the Eastern Range."

111.    For another example, the Vandenberg Space Force Base advertises to the space industry that the Vandenberg Space Force Base "Plans Office (XP)" is the "[s]ingle point of contact for . . . commercial space activities" for Vandenberg Space Force Base, totally omitting mention of any commercial entities or options whatsoever. *See* https://www.vandenberg.spaceforce.mil/About-Us/Fact-Sheets/Display/Article/338367/plans-and-programs (last accessed September 14, 2023).

112.    To take one example of how these statements have materially affected the decisions of commercial users, Audrey Powers, Vice President at Blue Origin Enterprises, L.P. ("Blue Origin"), stated on a 2018 call that "we'd [*i.e.*, Blue Origin] love to go somewhere else, but we can't.  The range mafia has a gun to our head" — referring to the Space Force.

113.    These advertisements and promotions are part of a coordinated campaign to influence commercial perception of the services that the Space Force offers, so as to bolster the idea that commercial users must select the Space Force for the widest suite of services possible.  For instance, in a November 4, 2022 article published on the Space Force website entitled "SLD 45 On-Boards New Launch

Partners To Meet Mission Demand," U.S. Space Force Lt. Col. Colin Mims was quoted as saying: "Previously, the fastest we had been able to on-board a customer and get them ready to launch was two years, but last year we were able to compress that timeline to six months[.] The reason we were able to on-board that specific partner so fast was because their requirements and proposed schedule was offered up front. . . . The men and women of SLD 45 are dedicated professionals that are laser focused on ensuring that every range customer and every launch campaign is conducted safely, on-time and with precision[.] We pride ourselves on providing world-class service and assured access to space!"

114.    In that same document, Tony Cole, 1st Range Operations Squadron (1 ROPS) was quoted as saying: "Our plan is to meet the increase in demand head on while continuing to look for efficiencies and partner with launch customers to support their needs[.] We'll continue to look for opportunities to develop and implement innovative processes and procedures to meet both [Eastern Range] and customer requirements."

115.    These statements advertise the Space Force as the sole provider of Day-of-Launch Services when the Space Force should not be offering such Day-of-Launch Services in the first place.

116.    Based on these actions of the Space Force, Launch on Demand has been materially damaged.  But for the Space Force's actions, there is a substantial

likelihood that commercial users would have retained Launch on Demand to provide Day-of-Launch Services, including the scheduled commercial launches identified in **Exhibit A**.

<u>**COUNT I**</u>
**INJUNCTIVE RELIEF FOR**
**VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT**
**(Agreement to Provide Scheduled Day-of-Launch Services)**
**5 U.S.C. § 500** *et seq.*

117.    Launch On Demand re-alleges and incorporates paragraphs 1 through 116 as if set forth fully in this count.

118.    The APA provides for an express grant from Congress for a private right of action to enforce federal rights against federal agencies, waiving the federal government's sovereign immunity over suits "seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted … in an official capacity or under color of legal authority."  5 U.S.C. § 702.

119.    The Department of Defense and the branches of the military, including the Space Force, are "agencies" under the APA. *See* 5 U.S.C. 551(1).

120.    Pursuant 5 U.S.C. § 702 of the APA, Launch On Demand seeks review of the Space Force's decision to provide Day-of-Launch Services to the scheduled launches listed in **Exhibit A** without complying with its statutory obligations.

121.    The Space Force has agreed to and is currently scheduled to provide Day-of-Launch Services for all commercial launches from Cape Canaveral and other Space Force spaceports in the United States, without certifying that these services are not available from United States commercial providers.

122.    This decision is a final agency action for which there is no adequate remedy in a court because: (i) it marks the consummation of the Space Force's decision making process, and (ii) it is an action by which rights and obligations have been determined, or from which legal consequences will flow.  In fact, the Space Force's actions have had a direct and immediate impact on Launch On Demand's day-to-day business.  Therefore, this decision is reviewable under the APA, 5 U.S.C. § 704.

123.    This decision is unlawful and should be set aside pursuant to 5 U.S.C. § 706(2).  The United States is statutorily barred from providing Day-of-Launch Services to commercial users, irrespective of any other commercial interests unless it "determines that . . . equivalent commercial services are not available on reasonable terms" from United States providers.  *See* 51 U.S.C. § 50504(a)(1)(D).

124.    As shown above, Launch On Demand has a substantial likelihood of success on the merits, given the Space Force's violation of the Commercial Space Launch Act.

125.    Launch On Demand will continue to suffer substantial irreparable

harm if an injunction is not granted in its favor because the Space Force will continue to interfere with Launch On Demand's ability to compete in the commercial space marketplace as provided for and envisioned by 51 U.S.C. §§ 50702(d)(4); 50504(a)(1)(D); 50903(b)(2); and 50913(a), which is contrary to the Congressional intent to have "free and competitive markets" in the space arena.

126.   This irreparable harm to Launch On Demand is concrete and measurable, and outweighs any harm an injunction may cause to the Space Force. Indeed, any injury to the Space Force is the result of its own failure to comply with the Congressional mandate and is significantly outweighed by Launch On Demand's right to participate in the commercial space marketplace, as intended by Congress.

127.   Granting an injunction would not impair the public's interests and would instead *serve* the public interest in a "free and competitive market" in the space arena.

128.   Launch On Demand has no adequate remedy at law.

129.   Thus, an injunction is both appropriate and necessary in this case as Launch On Demand has a right to enforce its federal rights against the United States.

**WHEREFORE**, Plaintiff Launch On Demand requests the Court enter an order granting a preliminary and permanent injunction against Defendant the

United States enjoining the Space Force from providing Day-of-Launch Services to scheduled commercial launches as currently agreed, and awarding any other relief the Court deems just and proper.

<u>**COUNT II**</u>
**INJUNCTIVE RELIEF FOR**
**VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT**
**(Failure to Act)**
**5 U.S.C. § 500** *et seq.*

130.    Launch On Demand re-alleges and incorporates paragraphs 1 through 116 as if set forth fully in this count.

131.    The APA provides for an express grant from Congress for a private right of action to enforce federal rights against federal agencies, waiving the federal government's sovereign immunity over suits "seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof . . . failed to act in an official capacity or under color of legal authority." 5 U.S.C. § 702.

132.    The Department of Defense and the branches of the military, including the Space Force, are "agencies" under the APA. *See* 5 U.S.C. 551(1).

133.    Pursuant 5 U.S.C. § 702 of the APA, Launch On Demand seeks review of the Space Force's decision to provide Day-of-Launch Services to the scheduled launches listed in **Exhibit A** without complying with its statutory obligations.

134.    The Space Force failed to make a required discrete and

nondiscretionary agency action when it failed to make the legally required determinations of non-availability, and to ensure the provision of the written certifications regarding the non-availability, as further detailed above, *prior to* deciding to provide the Space Force's own space services to commercial space launches.

135.    The Space Force wrongfully denied Launch On Demand the opportunity to compete as a commercial provider of Day-of-Launch Services, as allowed, encouraged, and intended by Congress and federal laws, causing Launch On Demand to suffer a concrete harm.

136.    By failing to make the requisite determinations of non-availability, and failing to obtain or ensure the provision of the requisite written certifications, the Space Force's actions constitute a final agency decision reviewable under 5 U.S.C. § 704.

137.    The United States is statutorily barred from providing Day-of-Launch Services to commercial users, irrespective of any other commercial interests unless it "determines that . . . equivalent commercial services are not available on reasonable terms" from United States providers.  *See* 51 U.S.C. § 50504(a)(1)(D).

138.    This Court has the authority to compel the Space Force to comply with its statutory obligations under the Commercial Space Launch Act, pursuant to 5 U.S.C. § 706(1).

139.   As shown above, Launch On Demand has a substantial likelihood of success on the merits.

140.   Launch On Demand will continue to suffer substantial irreparable harm if an injunction is not granted in its favor because the Space Force will continue to interfere with Launch On Demand's ability to compete in the commercial space marketplace as provided for and envisioned by 51 U.S.C. §§ 50702(d)(4); 50504(a)(1)(D); 50903(b)(2); and 50913(a).

141.   This irreparable harm to Launch On Demand is concrete and measurable, and outweighs any harm an injunction may cause to the Space Force. Indeed, any injury to the Space Force is the result of its own failure to comply with the Congressional mandate and is significantly outweighed by Launch On Demand's right to participate in the commercial space marketplace, as intended by Congress.

142.   Granting an injunction would not impair the public's interests and would instead *serve* the public interest in a "free and competitive market" in the space arena.

143.   Launch On Demand has no adequate remedy at law.

**WHEREFORE,** Plaintiff Launch On Demand requests the Court enter an order granting a preliminary and permanent injunction against Defendant the United States compelling the Space Force to determine and certify the non-

availability of United States commercial providers before agreeing to provide Day-of-Launch Services to commercial launches, and awarding any other relief the Court deems just and proper.

## COUNT III
### DECLARATORY RELIEF FOR
### VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT
### 5 U.S.C. § 500 *et seq.*

144.    Launch On Demand re-alleges and incorporates paragraphs 1 through 116 as if set forth fully in this count.

145.    The APA provides for an express grant from Congress for a private right of action to enforce federal rights against federal agencies, waiving the federal government's sovereign immunity over suits "seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority." 5 U.S.C. § 702.

146.    The Department of Defense and the branches of the military, including the Space Force, are "agencies" under the APA. *See* 5 U.S.C. 551(1).

147.    Pursuant 5 U.S.C. § 702 of the APA, Launch On Demand seeks review of the Space Force's decision to provide Day-of-Launch Services to the scheduled launches listed in **Exhibit A** without complying with its statutory obligations.

148.    The Space Force's actions, as described herein, constitute a final

agency action reviewable under 5 U.S.C. § 704.

149.    The United States is statutorily barred from providing Day-of-Launch Services to commercial users, irrespective of any other commercial interests unless it "determines that . . . equivalent commercial services are not available on reasonable terms" from United States providers.  *See* 51 U.S.C. § 50504(a)(1)(D).

150.    Launch On Demand has a bona fide, actual, and present practical need for a declaration that the Space Force and the Office of Space Commerce have each violated the Commercial Space Launch Act by:

(i)    agreeing to provide and scheduling Day-of-Launch Services for all commercial launches from Cape Canaveral and other spaceports in the United States, without certifying that these services are not available from United States commercial providers; and

(ii)    failing to take a required discrete and nondiscretionary agency action when it (a) failed to make the legally required determinations of non-availability, and (b) failed to ensure the provision of the written certifications regarding the non-availability, as further detailed above, *prior to* deciding to provide the Space Force's own space services to commercial space launches.

151.    The declaration sought by Launch On Demand concerns a present, ascertained, and ascertainable state of facts and present controversy as to the facts as explained herein.

152.    Launch On Demand's rights are dependent upon the facts and the law applicable to the facts as explained herein.

153.    Launch On Demand has an actual, present, adverse, and antagonistic interest in the subject matter, either in fact or law as explained herein.

154.    Launch On Demand's antagonist and adverse interests are all before the Court by proper process.

155.    The relief sought in this claim is not merely the giving of legal advice or the answer to questions propounded for curiosity.

156.    As such, Launch On Demand requests that the Court issue declaratory relief and find that the Space Force has violated the Commercial Space Launch Act.

**WHEREFORE**, Plaintiff Launch On Demand requests that the Court enter an order granting declaratory relief in favor of Launch On Demand and finding against Defendant the United States, declaring that the Space Force has violated the Commercial Space Launch Act, and awarding any other relief the Court deems just and proper.

## COUNT IV
## MONETARY DAMAGES FOR VIOLATION OF THE LANHAM ACT
## (FALSE ADVERTISING)
## 15 U.S.C. § 1125(a)(1)(B) & 15 U.S.C. § 1117

157.    Launch On Demand re-alleges and incorporates paragraphs 1 through 116 as if set forth fully in this count.

158.    The United States has violated Section 43(a)(1)(B) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B).

159.    The Space Force is directly competing with Launch On Demand in the area of commercial space Day-of-Launch Services.  The Space Force is doing so in a manner to divert commercial space business to the government and away from private commercial enterprise in violation of Congressional intent to have "free and competitive markets" in the space arena.

160.    The United States is statutorily barred from providing Day-of-Launch Services to commercial users, irrespective of any other commercial interests unless it "determines that . . . equivalent commercial services are not available on reasonable terms" from United States providers.  *See* 51 U.S.C. § 50504(a)(1)(D).

161.    The Space Force advertises and promotes itself as the *only* option for commercial space launches from federal facilities.  This false and misleading advertising and promotion occurred in interstate commerce and has been conveyed through direct statements by Space Force officials, as well as through written guidance and literature materials provided to commercial users.

162.    Specifically, the Space Force has misrepresented to commercial users that to launch from a federal facility, they have to retain the Space Force to provide the Day-of-Launch Services.  These false statements have been made at industry-wide events and Space Force designated "customer service" channels, such as the 2013 SVO Focus Group, the December 2022 industry teleconference, and the January 2025 National Space Club Florida Committee luncheon, where senior Space Force officials—including Paul Rosati and Colonel Meredith Beg—misled industry participants by asserting that only the Space Force could provide critical launch safety and operational services.

163.    These misrepresentations have been further embedded in official Space Force documents—including the CSOSA Annex A Template, Sample PI guidance, and the SLD 30 PSG – 2023 FINAL (CUI)—which misleadingly represent that flight safety, telemetry, weather forecasting, and other Day-of-Launch Services are exclusively provided by the Space Force.  These written materials mislead commercial users into believing that they have no option but to contract with the Space Force for these services, even though equivalent or superior commercial alternatives exist.

164.    These misrepresentations are literally false and misleading representations of material fact to consumers in violation of 15 U.S.C. § 1125(a)(1)(B).

165.  These literally false and/or misleading descriptions of fact actually deceived or tended to deceive a substantial number of consumers with regard to Launch On Demand and its services, technology, and capabilities.  This is evidenced by the fact that the Space Force has virtually monopolized the commercial Day-of-Launch Services field, servicing 100% of all commercial launches in the United States from Space Force locations, in violation of Congressional intent to have "free and competitive markets" in the space arena.

166.  These false and/or misleading descriptions of fact continue to actually deceive or tend to deceive a substantial number of consumers and continue to be material to consumers' commercial space decisions.

167.  The Space Force's false advertising and promoting, described herein, was intended to cause and did in fact cause deception to the public commercial space sector, misleading consumers as to the true characteristics and qualities of the Space Force's and Launch On Demand's services, goods, and commercial activities.  This has also resulted in widespread deception within the commercial space sector with regard to the true consumer choices of commercial space sector services.

168.  The Space Force has acted in this manner willfully and intentionally to virtually monopolize the provision of Day-of-Launch Services to the commercial space sector.

**WHEREFORE**, Plaintiff Launch On Demand requests that the Court enter judgement awarding Launch On Demand its damages in an amount to be determined at trial, including but not limited to the disgorgement of the Space Force's illegitimate profits; awarding Launch On Demand its attorneys' fees and costs as this is an exceptional case; and awarding any other relief the Court deems just and proper.

## JURY DEMAND

Launch On Demand requests a jury trial for all issues so triable under this count.

## COUNT V
## ALTERNATIVELY, INJUNCTIVE RELIEF FOR VIOLATION OF THE LANHAM ACT (FALSE ADVERTISING) 15 U.S.C. § 1125(a)(1)(B) & 15 U.S.C. § 1116

169.    Launch On Demand re-alleges and incorporates paragraphs 1 through 116 as if set forth fully in this count.

170.    The United States has violated Section 43(a)(1)(B) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B).

171.    The Space Force is directly competing with Launch On Demand in the area of commercial space Day-of-Launch Services. The Space Force is doing so in a manner to divert commercial space business to the government and away from private commercial enterprise in violation of Congressional intent to have "free and competitive markets" in the space arena.

172. The United States is statutorily barred from providing Day-of-Launch Services to commercial users, irrespective of any other commercial interests unless it "determines that . . . equivalent commercial services are not available on reasonable terms" from United States providers. *See* 51 U.S.C. § 50504(a)(1)(D).

173. The Space Force advertises and promotes itself as the *only* option for commercial space launches from federal facilities. This false and misleading advertising and promotion occurred in interstate commerce and has been conveyed through direct statements by Space Force officials, as well as through written guidance and literature materials provided to commercial users.

174. Specifically, the Space Force has misrepresented to commercial users that to launch from a federal facility, they have to retain the Space Force to provide the Day-of-Launch Services. These false statements have been made at industry-wide events and Space Force designated "customer service" channels, such as the 2013 SVO Focus Group, the December 2022 industry teleconference, and the January 2025 National Space Club Florida Committee luncheon, where senior Space Force officials—including Paul Rosati and Colonel Meredith Beg—misled industry participants by asserting that only the Space Force could provide critical launch safety and operational services.

175. These misrepresentations have been further embedded in official Space Force documents—including the CSOSA Annex A Template, Sample PI

guidance, and the SLD 30 PSG – 2023 FINAL (CUI)—which misleadingly represent that flight safety, telemetry, weather forecasting, and other Day-of-Launch Services are exclusively provided by the Space Force.  These written materials mislead commercial users into believing that they have no option but to contract with the Space Force for these services, even though equivalent or superior commercial alternatives exist.

176.  These misrepresentations are literally false and misleading representations of material fact to consumers in violation of 15 U.S.C. § 1125(a)(1)(B).

177.  These literally false and/or misleading descriptions of fact actually deceived or tended to deceive a substantial number of consumers with regard to Launch On Demand and its services, technology, and capabilities.  This is evidenced by the fact that the Space Force has virtually monopolized the commercial Day-of-Launch Services field, servicing 100% of all commercial launches in the United States from Space Force locations, in violation of Congressional intent to have "free and competitive markets" in the space arena.

178.  These false and/or misleading descriptions of fact continue to actually deceive or tend to deceive a substantial number of consumers and continue to be material to consumers' commercial space decisions.

179.  The Space Force's false advertising and promoting, described herein,

was intended to cause and did in fact cause deception to the public commercial space sector, misleading consumers as to the true characteristics and qualities of the Space Force's and Launch On Demand's services, goods, and commercial activities. This has also resulted in widespread deception within the commercial space sector with regard to the true consumer choices of commercial space sector services.

180.   The Space Force has acted in this manner willfully and intentionally to virtually monopolize the provision of Day-of-Launch Services to the commercial space sector.

181.   As a proximate result of the Space Force's acts described above, Launch On Demand has suffered and will continue to suffer irreparable harm in the form of commercial damage and injury to its business interests and sales, such as the direct diversion of sales and business from Launch On Demand to the Space Force, as well as damage to Launch On Demand's business reputation and goodwill. Without action from the Court to enjoin the Space Force from making misrepresentations and engaging in false advertising, Launch On Demand will continue to sustain serious loss of revenues, profits, and market share, as well as reputational damage.

182.   The remedies available at law, such as monetary damages are inadequate to compensate Launch On Demand for the injuries it has sustained.

183.    Considering the balance of hardships between the Space Force and Launch On Demand, a remedy in equity is warranted.

184.    The public interest would not be disserved by an injunction.  Indeed, the public interest is served when commercial enterprise is able to flourish without government diversion or influence, and when the government is held to Congressional intent to have "free and competitive markets" in the space arena.

WHEREFORE, Plaintiff Launch On Demand requests that the Court enter an order granting an injunction prohibiting Defendant the United States from representing to commercial consumers that the Space Force is the only available option for commercial space Day-of-Launch Services; and awarding any other relief the Court deems just and proper.

Dated: March 4, 2025                    Respectfully submitted,

By: */s/ Francisco A. Rodriguez*
Francisco A. Rodriguez (FBN 653446)
Francisco.Rodriguez@reedsmith.com
Ana R. Ulseth, Esq. (FBN 1022151)
AUlseth@reedsmith.com
Jonathan Florez (FBN 1059164)
Jonathan.florez@reedsmith.com

**REED SMITH LLP**
200 S. Biscayne Blvd, Suite 2600
Miami, FL 33131
Telephone: (786) 747-0200

*Counsel for Plaintiff Launch On Demand LLC*